UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **United States of America** | : |
| | : |
| v. | : Case No. 3:07cr132(JBA) |
| | : |
| **Kory Thomas** | : |

**RULING ON DEFENDANT'S MOTION TO SUPPRESS [DOC. # 22]**

Defendant Kory Thomas is charged with possession of cocaine base with intent to distribute and knowing possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 924(c)(1)(A). (Indictment [Doc. # 12] at 1–2.) The Defendant moves to suppress certain physical evidence seized by the police and a statement he made to the police as the result of what he claims was an unlawful detention and search which violated his Fourth and Fifth Amendment rights. (Def.'s Mot. at 1.)

## I. Factual Background

Critical to the resolution of this motion — and the outcome of the case itself — is reconstructing a series of events which occurred in rapid succession on the night of March 30, 2007. Around 11:00 p.m., the Defendant encountered several members of the Norwalk Police Department on Raymond Street in South Norwalk. Certain details of this encounter are the subject of dispute between Mr. Thomas and the Government, and even the officers present at the scene do not give the same account. A suppression

hearing was held on September 26, 2007, at which the Court heard testimony from Mr. Thomas as well as Norwalk Police Detective Terrence Blake and Officers Mark Suda and Daniel Osvalda.

Through his oral testimony, Mr. Thomas gave the following account. On the night of March 30, he was standing on Raymond Street with at least one other person when he noticed a car turn onto Raymond from South Main Street. The Defendant, having had several prior dealings with the Norwalk Police, recognized the driver as Officer Suda, and understood the car to be an unmarked police cruiser. Pulling alongside Mr. Thomas, Officer Suda spoke to the Defendant using his street name, "Snowball." In light of his previous encounters with the police and the fact that he was carrying drugs, Mr. Thomas wanted nothing to do with Officer Suda, and so he began to walk away, westward on Raymond Street toward South Main. After traveling what he estimates as 100 feet, and with Officer Suda now directly behind him, Mr. Thomas took a small plastic bag containing drugs and "flicked" his right wrist, casting the bag several feet off to his right. Although he knew it was a risky maneuver to discard drugs with the police standing nearby, Mr. Thomas was certain that he tossed the bag in such a way — using only his wrist — that Officer Suda could not have seen any arm movement from his position directly to the Defendant's rear.

About this time, Mr. Thomas noticed a second unmarked car

turning onto Raymond Street, which drove past him, stopped, and then backed up before stopping again ahead of him in the street. Getting out of the driver's seat, Detective Blake walked up to Mr. Thomas on the sidewalk and said, "What's up, Snowball?" Standing directly in front of him and impeding his path, Detective Blake asked Mr. Thomas what he was doing on Raymond Street, whether he was selling drugs, and whether he knew the other man who had been near Mr. Thomas before Officer Suda's car arrived.  In response, Mr. Thomas denied doing anything illegal. Detective Blake then grabbed a cell phone out of Mr. Thomas's hand; after seeing an image of a firearm displayed on the phone's screen, Detective Blake placed his hand on Mr. Thomas's arm and led him over to the nearby unmarked car.  Seeing that he was about to be searched, Mr. Thomas volunteered: "Blake, I'm going to let you know now I got a pistol right here on my right side." Detective Blake then handcuffed Mr. Thomas.  Mr. Thomas recalls that at some point before he was taken to the police station for processing, Officer Osvalda retrieved the plastic bag of narcotics that had been "flicked" just moments earlier.  With the bag in hand, Officer Osvalda walked up to Mr. Thomas to ask whether the bag was his; Mr. Thomas responded that it was not.

    The three police officers who testified recounted the events of March 30, and each gave an account at least somewhat at variance with the other two.  For example, the officers disagreed

about the exact position of each other, their cars, and Mr. Thomas on Raymond Street; the timing of Mr. Thomas's actions; and Mr. Thomas's physical condition and appearance. But the officers agreed on one issue critical to this motion: that Mr. Thomas tossed (or "flicked" or pitched) a small bag containing crack cocaine away from his right side as he was walking toward South Main Street. According to Officer Suda, after pulling up alongside Mr. Thomas and greeting him, Mr. Thomas turned and walked westward on Raymond Street toward South Main. Officer Suda then got out of his car and called after Mr. Thomas, but received no response. After Mr. Thomas had walked some distance, Officer Suda saw him make something of a tossing motion with his right hand, akin to how an option quarterback pitches a football laterally to his running back. Detective Blake and Officer Osvalda, who were in the trailing car, both corroborated Officer Suda's account of Mr. Thomas tossing an item off to his right side while walking toward South Main Street, although they disagreed about the position of the car at the moment of the Defendant's toss.

The officers also testified credibly regarding what occurred following Mr. Thomas discarding the narcotics. Detective Blake recounted that upon seeing the arm movement, he got out of the car and approached Mr. Thomas; within seconds, he heard Officer Osvalda call out that the item thrown was contraband, which

4

prompted Detective Blake to grab Mr. Thomas and place him in handcuffs. Officer Osvalda confirmed this sequence: he left the car upon seeing Mr. Thomas's arm movement, reached the thrown item within seconds, and immediately advised Detective Blake that he found drugs. Officer Suda's testimony was less clear on this point, but nothing in his account contradicts the order of events presented by his two fellow officers. Following Officer Osvalda's identification of the thrown object as drugs — which was confirmed by Officer Suda in arriving just after Osvalda — Detective Blake handcuffed Mr. Thomas, following which Mr. Thomas announced that he was armed. Officers Suda and Osvalda both recalled hearing Detective Blake call out that he found a gun, which led them return to the car to find Mr. Thomas in handcuffs.

The three officers testified that they were familiar with Mr. Thomas as a result of his previous criminal incidents, and that the location on Raymond Street where they encountered the Defendant was generally known as a high-crime area characterized by drug trafficking. In searching Mr. Thomas on Raymond Street and later at Norwalk Police headquarters, the officers seized a handgun, two cell phones, about $800 in cash, and two additional bags containing crack cocaine. Mr. Thomas's position is that the officers had insufficient justification during the encounter on Raymond Street to conduct an investigative search and seizure pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and that,

5

therefore, this physical evidence should be suppressed. The Defendant also argues that his statement to Detective Blake regarding the firearm should be suppressed as made in the context of an illegal seizure and without having received warnings required under Miranda v. Arizona, 384 U.S. 436 (1966). Mr. Thomas concedes the admissibility of the drugs which he cast aside and which were recovered by Officer Osvalda. (Def.'s Mot. at 10.)

**II. Discussion**

**A. Defendant's Physical Property**

As the Terry Court explained,

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

Terry, 392 U.S. at 30. The police may conduct a Terry stop and thus "briefly detain an individual for questioning" provided there is a "reasonable suspicion" of criminal activity; if so, the police "may frisk him if they reasonably believe he is armed and dangerous." United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007); see also Terry, 392 U.S. at 30. To not run afoul of

6

the Fourth Amendment, the officers must weigh the "totality of the circumstances" and "have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981); see also United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000). Any search conducted must then be "reasonably limited in scope." United States v. Casado, 303 F.3d 440, 447 (2d Cir. 2002) (quoting Sibron v. New York, 392 U.S. 40, 65 (1968)). But even "[c]onduct [which is] as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991).

The issue is thus whether the circumstances leading up to Mr. Thomas's detention created a reasonable suspicion that he was engaged in criminal activity. Courts have generally upheld the validity of searches and seizures conducted under similar conditions. For example, In Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000), the Court held that the police were "justified in suspecting that [the defendant] was involved in criminal activity" based on the fact that the officers encountered him in a high-crime area notorious for drug trafficking, and that the defendant fled when he noticed the police. Although neither factor would necessarily be sufficient by itself, the totality of the circumstances were such that the officers' further

investigation was lawful. Id. at 125. In the context of drug investigations generally, an officer's "suspicion will be reasonable if the conduct as a whole would appear suspect to one familiar with the practices" of drug dealers and traffickers, even if the "pattern of behavior [would be] innocuous to the untrained observer." United States v. Ramirez-Cifuentes, 682 F.2d 337, 342 (2d Cir. 1982); see also United States v. Christian, 187 F.3d 663, 668 (D.C. Cir. 1999) (validating officer's search after observing the defendant, in an area known for drug activity, throwing possible contraband into a car upon seeing the officer); United States v. Atlas, 94 F.3d 447, 450–51 (8th Cir. 1996) (finding officer's suspicion reasonable given presence in high-crime area, defendant's evasive manner, and discarding of a bag); United States v. Prior, 941 F.2d 427, 429–30 (6th Cir. 1991) (upholding Terry stop after police saw defendant throw material during an investigation of known drug trafficking nearby).

In this case, the evidence presented at the suppression hearing and credited by the Court established that the officers saw and recognized Mr. Thomas in a known high-crime area; that the Defendant walked away from Officer Suda and in so doing tossed aside an object; that the officers suspected this was contraband and confirmed that it was in fact crack cocaine; and that Detective Blake then placed Mr. Thomas in handcuffs.

8

Nowhere in this sequence of events did the officers act unlawfully. Contrary to Defendant's position, this does not mean that "mere littering" in an area associated with drug dealing always justifies detention; rather, it was the fact of the toss together with all of the other circumstances that together created a reasonable suspicion that there was criminal activity afoot. Mr. Thomas also contends that he was actually restrained at an earlier point — specifically, when Detective Blake obstructed his path on the sidewalk. However, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). Contrary to Defendant's account, the Court finds that not until Mr. Thomas was grabbed and placed in handcuffs by Detective Blake did the encounter implicate the Fourth Amendment.

Defense counsel also made much of the apparent inconsistencies in the officers' testimony, arguing that the differences were sufficient to warrant discarding much of this testimony altogether. The Court agrees that the three accounts of what happened on March 30 were not entirely congruous. But human memory is imperfect, particularly with respect to events which, as here, transpired very quickly. Exactly what a given person remembers about a past event depends on his or her individual makeup and experiences, which is "why two different

9

people can sometimes have radically divergent recollections of the same event." Daniel L. Schacter, Searching for Memory 52 (1996). Most importantly, however, the officers' testimony was not contradictory with respect to the key issue of whether and how Mr. Thomas tossed aside the bag of narcotics. Detective Blake and Officer Osvalda disagreed about whether Mr. Thomas was ahead of or behind their car when he made his "flicking" motion; but any doubt that arose from this was effectively erased by Mr. Thomas's admission that he did in fact cast aside a bag containing crack cocaine while seeking to avoid contact with the police. Although Mr. Thomas believes that he "flicked" the bag of narcotics so that the officers could not see his wrist or arm move, the evidence indicates that the Defendant was unsuccessful in his purpose.

Taken together with the other aspects of the encounter that were consistent across the three officers' accounts, Mr. Thomas's toss of what the officers identified as narcotics provided sufficient justification for stopping Mr. Thomas for a further investigation. Therefore, there is no basis on which to suppress the physical evidence seized from the Defendant.

**B.   Defendant's Statement**

Mr. Thomas also contends that his statement to Detective Blake about the gun he was carrying should be suppressed as made without Miranda warnings. The Second Circuit has explained that

10

"[a] suspect is entitled to Miranda warnings only if he or she is interrogated while 'in custody.'" Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998) (quoting Thompson v. Keohane, 516 U.S. 99, 100-01 (1995)). But the question is not, as Defendant characterizes it, whether Mr. Thomas was in custody when he made the statement; according to the factual chronology credited by the Court, Detective Blake was in the process of handcuffing Mr. Thomas when he mentioned that he had a gun. In Miranda, the Court emphasized that volunteered statements were not the subject of its holding: "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. 384 U.S. at 478. "[T]he special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation," which the Court described as "reflect[ing] a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis, 446 U.S. 291, 300 (1980).

The evidence establishes that Mr. Thomas was not interrogated by any of the officers prior to making the statement about his gun. According to the Innis Court, "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," meaning "any words or actions on the part of the

police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 300-01 (footnotes omitted); see also United States v. Moody, 649 F.2d 124, 127-28 (2d Cir. 1981).  Mr. Thomas's own account shows that any conversation initiated by Detective Blake did not amount to an interrogation:

> Q.  Did [Detective Blake] ask you any questions prior to putting his hand on you other than, "Is this what they call you now, 'New Money'?"
>
> A.  No.
>
> Q.  Did you agree to talk to him?
>
> A.  No, I didn't. . . .
>
> Q.  After he's got his hand on your arm and he's walking you to the car, what did you say?
>
> A.  Well, they put my hands on like the front hood and I said, "Blake, I'm going to let you know now I got a pistol right here on my right side," and that's when he proceeded to handcuff me.

By its own terms, this exchange does not implicate the Fifth Amendment concerns addressed by Miranda.  Mr. Thomas merely volunteered that he was carrying a gun, and there are no grounds on which to suppress such a statement.

## III. Conclusion

Accordingly, Defendant's Motion to Suppress [Doc. # 22] is denied.

IT IS SO ORDERED.

/s/
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 26th day of October, 2007.**